KELLI L. SAGER (State Bar No. 120162)
  kellisager@dwt.com
ERIC M. STAHL (State Bar No. 292637)
  ericstahl@dwt.com
DIANA PALACIOS (State Bar No. 290923)
  dianapalacios@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
Telephone: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Defendants
BLUMHOUSE PRODUCTIONS, LLC,
and JEREMY SLATER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER "CHRIS" WAYNE FILLMORE, an individual,<br><br>                    Plaintiff,<br><br>          vs.<br><br>LIONSGATE FILMS; JASON BLUM individually and/or d/b/a Blumhouse Productions, a proprietorship; JEANETTE BRILL individually and/or d/b/a Blumhouse Productions, a proprietorship; LUKE DAWSON individually; MATTHEW KAPLAN individually and/or d/b/a Chapter One Films, a proprietorship; ROBYN MARSHALL individually and/or d/b/a Chapter One Films, a proprietorship; JIMMY MILLER individually and/or d/b/a Mosaic Management & Production, a proprietorship; RICK OSAKO individually and/or d/b/a Catchlight Films, a proprietorship; JEREMY SLATER, individually; CODY ZWIEG individually; and DOES 1-10 inclusive,<br><br>                    Defendants. | Case No. **2:16-CV-04348-AB-SS**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 12(b)(6))**<br><br>Hearing Date:     May 8, 2017<br>Time:                10:00 a.m.<br>Courtroom:       7B<br><br>[Request For Judicial Notice; Declaration of Eric M. Stahl With Exs. 1 and 3Through 9, Notice Of Lodging Of Ex. 2, Notice Of Manual Filing; and [Proposed] Order Filed Concurrently] |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on May 8, 2017, at 10:00 a.m., in Courtroom 7B of the United States District Court for the Central District of California, located at 350 West First Street, Los Angeles, CA 90012, Defendants[1] will and hereby do move to dismiss with prejudice the First Amended Complaint ("FAC") filed by Plaintiff Christopher Wayne Fillmore ("Plaintiff").

This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiff's sole cause of action for copyright infringement fails to state a claim for which relief can be granted, including without limitation on the ground that there is no substantial similarity of protected expression between his manuscript, "Lazari Taxa" ("Manuscript") and Defendants' motion picture, "The Lazarus Effect" ("the Film").  See Memorandum, Section IV.B.

This Motion is made following the conference of Defendants' counsel and Plaintiff pursuant to L.R. 7-3, which took place on March 30, 2017.  See Declaration of Eric M. Stahl ¶ 5.

This Motion is based on the Notice Of Motion, the attached Memorandum Of Points And Authorities, the concurrently-filed Declaration of Eric M. Stahl with Exhibits 1 and 3 through 9, Request For Judicial Notice, and Notice Of Lodging With Exhibit 2; all other matters of which this Court may take judicial notice, the pleadings, files, and records in this action, and on such other argument as may be heard by this Court.

---

[1] This motion is brought on behalf of Blumhouse Productions, LLC (erroneously identified in the FAC as "Blumhouse Productions, a proprietorship") and Jeremy Slater.  As of this date, none of the other defendants has been served properly with the First Amended Complaint, as required by this Court's March 17, 2017 Order.

i

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

DATED:  April 7, 2017

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ERIC M. STAHL
DIANA PALACIOS

By:_____ */s/ Kelli L. Sager*_____
                    Kelli L. Sager

Attorneys for Defendants
BLUMHOUSE PRODUCTIONS, LLC,
and JEREMY SLATER

ii

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

Page

I.      SUMMARY OF ARGUMENT ................................................................ 1

II.     SUMMARY OF FACTS ...................................................................... 2

        A.      Procedural Background. .................................................... 2

        B.      Allegations in the FAC. ..................................................... 3

III.    OVERVIEW OF WORKS AT ISSUE .................................................. 4

        A.      Plaintiff's Manuscript ....................................................... 4

        B.      The Film ............................................................................ 6

IV.     PLAINTIFF'S COPYRIGHT CLAIM FAILS AS A MATTER OF
        LAW ............................................................................................... 7

        A.      Plaintiff Has Not Sufficiently Alleged Facts Demonstrating That
                Defendants Had Access To His Work ................................ 7

        B.      Plaintiff Cannot Meet His Burden Of Demonstrating Substantial
                Similarity Of Protected Expression. .................................. 8

                1.      The Absence Of Substantial Similarity Can Be
                        Determined By The Court On A Motion to Dismiss. ............... 8

                2.      The Works Are Not Substantially Similar. ............................. 10

                        a.      Any Similarities Between The Manuscript and
                                The Film Are Outside The Scope Of
                                Copyright Protection. ...................................... 11

                        b.      None of the Works' Protectable Elements Are
                                Substantially Similar. ...................................... 13

V.      CONCLUSION ............................................................................... 22

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF AUTHORITIES

Page(s)

**Cases**

8th Wonder Entm't, LLC v. Viacom Int'l, Inc.,
  2016 WL 6882832 (C.D. Cal. Nov. 22, 2016)..................................................12, 19

Apple Computer, Inc. v. Microsoft Corp.,
  35 F.3d 1435 (9th Cir. 1994) ...........................................................................10, 11

Balistreri v. Pacifica Police Dep't,
  901 F.2d 696 (9th Cir. 1988) ....................................................................................8

Basile v. Sony Pictures Entm't Inc.,
  2014 WL 12521344 (C.D. Cal. Aug. 19, 2014) .......................................................9

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007).............................................................................................8, 14

Berkic v. Crichton,
  761 F.2d 1289 (9th Cir. 1985) .............................................................11, 14, 17, 18

Cavalier v. Random House, Inc.,
  297 F.3d 815 (9th Cir. 2002) ...........................................................................passim

CDN Inc. v, Kapes,
  197 F.3d 1256 (9th Cir. 1999) ..................................................................................7

Chase-Riboud v. Dreamworks, Inc.,
  987 F. Supp. 1222 (C.D. Cal. 1997) .........................................................................7

Chaset v. Fleer/Skybox Int'l,
  300 F.3d 1083 (9th Cir. 2002) ................................................................................14

Christianson v. West Pub. Co.,
  149 F.2d 202 (9th Cir. 1945) ....................................................................................9

DC Comics v. Towle,
  802 F.3d 1012 (9th Cir. 2015) ................................................................................21

DuckHole Inc. v. NBC Universal Media LLC,
  2013 WL 5797279 (C.D. Cal. Sept. 6, 2013) ...........................................................9

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Ets-Hokin v. Skyy Spirits, Inc.,
  225 F.3d 1068 (9th Cir. 2000) ................................................. 11

Funky Films, Inc. v. Time Warner Entertainment Co.,
  462 F.3d 1072 (9th Cir. 2006) ................................................. 17

Gadh v. Spiegel,
  2014 WL 1778950 (C.D. Cal. Apr. 2, 2014) .............................. 9

Gold Glove Prods., LLC v. Handfield,
  648 Fed. Appx. 679 (9th Cir. 2016)............................... 10, 12, 19

Harper & Row Publishers, Inc. v. Nation Enters.,
  471 U.S. 539 (1985) ................................................................ 11

Heusey v. Emmerich,
  2015 WL 12765115 (C.D. Cal. Apr. 9, 2015) .................. 9, 10, 14, 20

In re Lazarus,
  276 F. Supp. 434 (C.D. Cal. 1967) ......................................... 13

In re Ohio Execution Protocol Litig.,
  2017 WL 378690 (S.D. Ohio Jan. 26, 2017) ........................... 13

Kouf v. Walt Disney Films & Television,
  16 F.3d 1042 (9th Cir. 1994) ............................................ 10, 14

Kullberg v. Pure Flix Entm't LLC,
  2016 WL 7324155 (C.D. Cal. Oct. 12, 2016).........................*passim*

Mir v. Little Co. of Mary Hosp.,
  844 F.2d 646 (9th Cir. 1988) ................................................... 9

Olson v. NBC,
  855 F.2d 1446 (9th Cir. 1988) ....................................... 11, 19, 20

Rice v. Fox Broad. Co.,
  330 F.3d 1170 (9th Cir. 2003) ................................................. 11

Satava v. Lowry,
  323 F.3d 805 (9th Cir. 2003) ................................................... 11

Shaw v. Lindheim,
  919 F.2d 1353 (9th Cir. 1990) ................................................. 13

v

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,
    562 F.2d 1157 (9th Cir. 1977) .............................................................. 11

Silas v. Home Box Office, Inc.,
    201 F. Supp. 3d 1158, 1168 (C.D. Cal. 2016) ................................. *passim*

Stern v. Does,
    978 F. Supp. 2d 1031 (C.D. Cal. 2011) ............................................. 20

Three Boys Music Corp. v. Bolton,
    212 F.3d 477 (9th Cir. 2000) ...................................................... 7, 10

Walker v. Time Life Films, Inc.,
    784 F.2d 44 (2d Cir. 1986)............................................................ 21

Wild v. NBC Universal, Inc.,
    788 F. Supp. 2d 1083 (C.D. Cal. 2011) .............................................. 9

Zella v. E.W. Scripps Co.,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ......................................... *passim*

**Statutes**

17 U.S.C.
    § 102........................................................................................ 11
    § 505........................................................................................ 22

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................... 4, 8, 9, 10

Federal Rule of Evidence 201 ............................................................ 9

**Other Authorities**

4-13 Nimmer on Copyright § 13.02 (2012 ) ............................................ 8

DEFENDANTS' MOTION TO DISMISS
4846-9547-3477v.7 0103245-000004

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.       SUMMARY OF ARGUMENT

This copyright action involves two works so facially dissimilar that they cannot plausibly support a claim of copyright infringement.  Plaintiff Christopher Wayne Fillmore alleges that Defendants' feature film "The Lazarus Effect" (the "Film") – a horror movie about a medical experiment gone terribly awry – copies his unpublished manuscript, a murder mystery in which two detectives frantically search for a serial killer (the "Manuscript").  Both works include the concept of bringing dead people back to life.  But other than that conceit – which is not protected by copyright law – and references that, for obvious reasons, evoke the biblical figure Lazarus, the works have nothing in common.

To state a claim for copyright infringement, a plaintiff must plausibly allege the works at issue are substantially similar with respect to protectable expression. The Court must evaluate substantial similarity by filtering out unprotected elements, such as ideas and general plot, then comparing <u>only</u> the works' original protected expression.  <u>See</u> Section IV.B.2.a.

Here, neither Plaintiff nor anyone else can claim exclusive rights in a general plotline about human resurrection.  Copyright law may protect a particular original expression of that idea – but the two works at issue here express the "idea" of resurrection in radically different ways.  Plaintiff's Manuscript describes a future world that includes a government-sanctioned reanimation procedure that has been available for more than 15 years, resulting in thousands and thousands of "Necrosapiens" who, for the most part, lead normal lives among the general population.  Defendants' Film, in contrast, depicts a university research project designed to help doctors treat coma patients, which accidentally leads to the discovery of the potential for reanimating the dead – and in turn, results in a single instance of human reanimation.  The experiment bestows the resuscitated character with supernatural powers, which she turns on her colleagues in a fit of vengeance.

On a motion to dismiss, this Court can review works identified in the complaint to determine if there is substantial similarity of protectable expression. Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007). Defendants have submitted both their Film ("The Lazarus Project") and Plaintiff's manuscript ("Lazari Taxa") for this Court's review. Exs. 1, 2. A comparison of the two works establishes easily that the protected elements of the two works are strikingly dissimilar. Among other things, the plots are distinct (Plaintiff's Manuscript is a police "whodunit," while Defendants' Film is a horror film involving researchers terrorized by one of their own colleagues); the settings are radically different (Plaintiff's story takes place in a variety of locations throughout a fictional city and in the Louisiana bayou, some 90 years in the future; Defendants' Film is set in present-day Berkeley, and takes place almost entirely in a university research lab); and the two works have no overlapping or remotely similar characters or dialogue.

For these and other reasons discussed below, Plaintiff cannot demonstrate the requisite "substantial similarity" of protected expression between his Manuscript and Defendants' Film. Consequently, his copyright claim must be dismissed with prejudice.

## II.   SUMMARY OF FACTS

### A.   Procedural Background.

Plaintiff filed this action in the Southern District of Indiana on June 9, 2016, against more than a dozen individuals and entities alleged to have been involved in the Film. Dkt. No. 1. Recognizing that Indiana was an improper venue (because all of the named defendants were California residents), that court sua sponte transferred the matter to this Court as of June 17, 2016. Dkt. No. 4, 7.

On February 17, 2017, Plaintiff moved to amend his complaint to add yet another named Defendant, Lionsgate Films, and to make various minor changes in his pleading. Dkt. No. 34. This Court granted Plaintiff's motion on March 17, 2017,

and Plaintiff filed his First Amended Complaint ("FAC") on March 21, 2017.  Dkt. No. 43.[2]

## B.    Allegations in the FAC.

Plaintiff alleges that he a full-time school district employee in Indiana who writes "[i]n his spare time."  FAC ¶ 8.  He alleges that in 2004 and 2005, he authored the allegedly infringed work in this action, a manuscript entitled "Laza[u]ri Taxa" ("Manuscript").[3]  Id. ¶ 3, 22.  Plaintiff alleges that he obtained a copyright registration in the Manuscript (then titled "Necrostory") on August 21, 2006.[4]

According to the FAC, each of the Defendants was involved in the creation, production, or distribution of a feature motion picture entitled "The Lazarus Effect" ("Film"), which was released in 2015.  FAC ¶¶ 2, 8-19.

Plaintiff did not publish his Manuscript.  He claims it was "commercially available through a POD (print on demand) publisher" between 2006 and 2013, but although he undoubtedly has a record of any purchases, he does not allege that any of the Defendants purchased the Manuscript from that source.  FAC ¶ 25.  He also alleges he submitted the Manuscript to unidentified "agents, management companies, and publishers, etc."  Id. ¶ 24.  But he does not allege that he ever sent the Manuscript to any of the Defendants, or even that it was ever sent to any studio or motion picture producer.

---

[2] Twice, Plaintiff has attempted to obtain default judgments against some of the Defendants.  His first attempt, in December 2016, was struck by the Court on the ground that he had failed to properly serve those Defendants.  Dkt. No. 30.  His second attempt, filed March 30, 2017, was withdrawn after defense counsel pointed out responses were not yet due from the allegedly "defaulting" Defendants. Dkt. Nos. 47, 48.

[3] The title of the Manuscript appears as "Lazari Taxa" on its cover, but "Lazarui Taxa" on the title page.

[4] Plaintiff also alleges he registered a "sequel" in the Manuscript, also called "Lazarui Taxa," in 2008; but the "Infringed Work" alleged in his complaint is the 2006 manuscript.  FAC ¶ 23.  Defendants have requested copies of these works from the U.S. Copyright Office; a copy of the Manuscript also was provided to defense counsel by Plaintiff.  Stahl Decl. ¶ 3; Ex. 2.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Plaintiff alleges that he attended a "pre-release screening" of the Film in February 2015, which raised his "suspicions" about "the possibility that the [Film] was based on and formulated in substantial part upon the Infringing work."  FAC ¶ 27.  He then asserts that there are "similarities" between the two works (id. ¶ 28(a)), but does not explain what those purported similarities are.  The FAC alleges a single cause of action, for copyright infringement.  Id. ¶¶ 32-37.

## III.   OVERVIEW OF WORKS AT ISSUE

When ruling on a Rule 12(b)(6) motion, the Court can consider "exhibits submitted with the complaint," as well as "documents which are not physically attached to the complaint but 'whose contents are alleged in [the] complaint and whose authenticity no party questions.'"  Zella, 529 F. Supp. 2d at, 1128, quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.1994); Silas v. Home Box Office, Inc., 201 F. Supp. 3d 1158, 1168 (C.D. Cal. 2016) ("[w]hen specific documents are referenced in a complaint, but not attached to the complaint, a defendant may introduce those documents" on a Rule 12(b)(6) motion).  Here, the FAC refers to the contents of both Plaintiff's Manuscript and Defendants' Film, and Plaintiff's sole cause of action is based entirely on the contents of those two works.  FAC ¶¶ 2, 3.  Accordingly, Defendants are submitting for the Court's review a copy of the Manuscript as provided by Plaintiff, and a DVD containing the Film.  See Request for Judicial Notice ("RJN"), Exs. 1 (Manuscript) and 2 (Film).

### A.   Plaintiff's Manuscript

The Manuscript is a 146-page work, written in the form of a novel.  It contains a summary at the beginning, which reads:

In the not too distant future, science has excelled with doctors successfully able to reanimate human beings.  Only now, a sadistic serial killer is targeting these people for reasons unknown.  It is up to Detectives Vincent Dobbs and Clara Ellion to not only solve their first Necrocide case against a city torn on the issue of resurrection, but also uncover the mystery of their origins that virtually unravels before their eyes the deeper they investigate…. With the help of Dr. Sean Brindle; a brilliant forensic

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

scientist, and reporter Maddox Lewis of The Interpreter, you follow as they overcome the hurdles of bad leads, encumbering physicians at the Lazarus Centers (where humans are reanimated), copycat crimes, and the bureaucratic limbo the case inevitably gets put into by the FBI… only to reveal an even more perplexing resolve.

Manuscript, Ex. 1, second page (inside front cover).

The Manuscript, in short, is a murder mystery involving a killer whose victims are all reanimated "Necrosapiens." The story in the Manuscript takes place many years into the future, in the year 2096.[5]  Human reanimation has been possible for at least 16 years, and has become commonplace. Manuscript, Ex. 1, p. 4, 79. The government has encouraged one million people to sign up for eventual resurrection, and many thousands of Necrosapiens already exist. Id. p. 4. Necrosapiens face some personal discrimination, which creates part of the storyline about who might be killing them. Id. p. 6, 52. Some Necrosapiens also suffer a side effect known as "soul flux," which can result in personality displacement – a condition that is usually minor, although it can be more severe in Necrosapiens who have been reanimated multiple times. Id. pp. 4, 53, 61. For the most part, however, the Manuscript describes Necrosapiens as ordinary citizens who simply want to go about their reinstated lives like everyone else. See, e.g., id. p. 57.

The storyline follows two detectives as they spend weeks hunting for clues to the serial killings, across the fictional city of New Athens – in warehouses, city squares, apartments, hospitals and parks – and even to the Louisiana bayou, where a voodoo priestess provides mystical guidance about how to solve the crime, and a dark prediction that one of her visitors will be "sacrificed" when they confront the killer. Eventually piecing together the killer's pattern of selecting victims, the detectives set a trap that leads to his capture, but not before he is able to kill one last

---

[5] The exact year is not stated in the Manuscript, but on their trip to Louisiana, the protagonists rent a 2096 Toyota. Manuscript, Ex. 1, p. 79.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

time.  In typical "whodunit" fashion, the killer's identity is not revealed until the final page.  No explanation is given for the killer's behavior.

**B.      The Film**

The Film is a feature-length theatrically released horror movie, starring Olivia Wilde and Mark Duplass.  Unlike the Manuscript, it is set in the present day, in a world where human reanimation does not yet exist.  A group of medical researchers led by Dr. Frank Walton and his fiancée Zoe McConnell have a grant to "study new methods of arresting neural decay in coma patients."  Film, Ex. 2, at 25:23.[6]  In the course of this "Lazarus Project," they inadvertently discover that their serum may be able to bring deceased animals back to life.  Early in the Film, they succeed in resuscitating a dog.  Id., 13:55.  When the university and the project's corporate sponsor learn of the unauthorized experiment, the university shuts down the project, and the corporation seizes all of the equipment and research.  Devastated by having their three years of work confiscated, the researchers sneak back into the lab to recreate the experiment, so that they will have proof of their discovery.  But as Zoe flips the electrical switch to replicate the experiment on a second dog, she is accidentally electrocuted.  Id., 32:05.  Unable to revive her through conventional means, a desperate Frank makes the fateful decision to resuscitate Zoe with some of the remaining serum.  Id., 36:00.

In contrast to the relatively benign effects of reanimation described in the Manuscript, and the normalcy with which the Necrosapiens live, Zoe's resurrection is horrific.  She realizes a past mistake – which haunted her dreams during her first life – has condemned her for eternity.  Physically, she appears to alternately deteriorate and regenerate.  Most ominously, she now has the power to read minds, move objects, and levitate.  Angered that her former colleagues and fiancé regret bringing

---

[6] Citations are to the DVD time code.

DEFENDANTS' MOTION TO DISMISS
4846-9547-3477v.7 0103245-000004

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

her back to life, she uses her newfound powers to trap them in the medical lab and kill them, one by one.  See, e.g., id., 58:40.

## IV.   PLAINTIFF'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW

Plaintiff's copyright infringement claim requires him to prove "(1) ownership of a valid copyright and (2) copying by the defendant of protectable elements of the work." CDN Inc. v, Kapes, 197 F.3d 1256, 1258 (9th Cir. 1999); Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002).  Where, as here, there is no allegation or evidence of direct copying, the second element requires Plaintiff to prove both that the Defendants had "access" to the Plaintiff's copyrighted work, and that there is "substantial similarity" of protected expression between the copyrighted work and defendants' work.  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir. 2000); see also Chase-Riboud v. Dreamworks, Inc., 987 F. Supp. 1222, 1225 (C.D. Cal. 1997).  Plaintiff cannot meet these requirements.

### A.   Plaintiff Has Not Sufficiently Alleged Facts Demonstrating That Defendants Had Access To His Work.

Plaintiff does not allege any facts supporting a claim that any of the Defendants had access to his unpublished Manuscript, as required to state a copyright infringement claim.  Three Boys Music Corp., 212 F.3d at 482.  This is not a case where a plaintiff creator submitted his work to a defendant producer or studio for its review and consideration.  See, e.g., Silas, 201 F. Supp. 3d at 1166.  To the contrary, there is no allegation that Plaintiff shared his Manuscript with any of the Defendants, or that any of the Defendants obtained the work in some other manner.  The only "facts" alleged are that Plaintiff sent the Manuscript to unspecified "agents, management companies, and publishers" – without any identification or indication of a relationship with any of the Defendants – and that the Manuscript was available for a time via a print-on-demand website, but apparently not purchased by any of the Defendants (if, in fact, it was purchased by anyone).  FAC ¶¶ 24, 25.  Access may not be inferred through "mere speculation or conjecture."  Three Boys, 212 F.3d at

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

482; see also 4-13 Nimmer on Copyright § 13.02 (2012 ) (same); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Because Plaintiff has failed to allege any plausible manner in which any of the Defendants had access to his work, his copyright claim fails for this reason alone.

**B.  Plaintiff Cannot Meet His Burden Of Demonstrating Substantial Similarity Of Protected Expression.**

Even if Plaintiff had met his burden as to "access" – which he has not – he cannot meet his burden of demonstrating that the protected expression in the two works at issue are substantially similar.  For this independent reason, his copyright claim should be dismissed, without leave to amend.

**1.  The Absence Of Substantial Similarity Can Be Determined By The Court On A Motion to Dismiss.**

Dismissal under Fed. R. Civ. P. 12(b)(6) is proper when a complaint lacks "a cognizable legal theory," or "sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.1988).  While the Court must accept as true "all material allegations in the complaint, as well as reasonable inferences to be drawn from them," it need not accept as true "unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast as factual allegations."  Zella, 529 F. Supp. 2d at 1127-28.  To survive a motion to dismiss, a complaint must allege facts sufficient to raise a right to relief that is above the level of mere speculation, and that is plausible on its face.  Twombly, 550 U.S. at 555.

In copyright cases, it is well-established that a court can compare the two works forming the basis of an infringement claim, and dismiss the claim as a matter of law if no reasonable factfinder could find infringement.  "[T]he Ninth Circuit has noted that '[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'"  Zella,

529 F. Supp. 2d at 1130 (quoting Christianson v. West Pub. Co., 149 F.2d 202, 203 (9th Cir. 1945)). "For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a motion to dismiss)." Id. at 1130; see also Heusey v. Emmerich, 2015 CV 14-06810-AB (EX), 2015 WL 12765115, at *3 (C.D. Cal. Apr. 9, 2015) (dismissing copyright claim under Rule 12(b)(6) after comparing plaintiff's screenplay and defendant's screenplay and movie – both about the authorship of works attributed to Shakespeare – and finding protectable elements were not similar).[7]

In evaluating whether a plaintiff has stated a plausible copyright claim, it is also proper for the Court "to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201." Zella, 529 F. Supp. 2d at 1128, citing Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir.1988). These include "generic elements of creative works," Zella, 529 F. Supp. 2d at 1129, judicial notice "of elements that are common to a given genre." Silas, 201 F. Supp. 3d at 1170, and judicial notice of "historical facts" and other "unprotectable elements." Heusey, 2015 WL 12765115, at *4. See, e.g., DuckHole Inc. v. NBC Universal Media LLC, 2013 WL 5797279,, at *4 (C.D. Cal. Sept. 6, 2013) (taking judicial notice of generic elements of veterinary-themed sitcoms that include: (1) settings of an operating room, examination room, and lobby; (2) pets; (3) a comedic tone and; and (4) romantic relationships, because they "can be verified simply by watching television for any length of time").

---

[7] Accord, Wild v. NBC Universal, Inc., 788 F. Supp. 2d 1083, 1097 (C.D. Cal. 2011) (dismissing infringement claim under Rule 12(b)(6) after comparing works), aff'd, 513 Fed. Appx. 640 (9th Cir. 2013); Silas, 201 F. Supp. 3d at 1171 (granting motion to dismiss); Kullberg v. Pure Flix Entm't LLC, 2016 WL 7324155, at *2 (C.D. Cal. Oct. 12, 2016) (same); Basile v. Sony Pictures Entm't Inc., 2014 WL 12521344, at *2 (C.D. Cal. Aug. 19, 2014) (same); Gadh v. Spiegel, 2014 WL 1778950, *3 n.2 (C.D. Cal. Apr. 2, 2014) (same, collecting cases).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Here, by comparing Plaintiff's Manuscript and Defendants' Film, and by considering judicially noticeable facts, this Court can and should find that the two works have – at most – share only generic, unprotectable attributes, and do not contain protectable expression that is substantially similar as a matter of law.

### 2.    The Works Are Not Substantially Similar.

To determine whether there is substantial similarity of protected expression sufficient to state a copyright claim, the Ninth Circuit uses an "extrinsic/objective" test to compare the works.  Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir. 1994); Kouf v. Walt Disney Films & Television, 16 F.3d 1042, 1045 (9th Cir. 1994); Three Boys Music, 212 F.3d at 485.

The "extrinsic" component tests for similarity of ideas and expression based on objective external criteria; the "intrinsic" component is subjective, and tests for "similarity of expression from the standpoint of the ordinary reasonable observer." Apple Computer, 35 F.3d at 1442.  "On a motion to dismiss, only the extrinsic test is relevant." Heusey, 2015 WL 12765115, at *3.  "Without extrinsic similarity, a copyright claim cannot survive."  Silas, 201 F. Supp. 3d at 1167 (dismissing under Rule 12(b)(6) for lack of similarity in extrinsic elements).

In comparing the works, the court must filter out any parts of the copyrighted work that are not protected; only "protected expression" is relevant to assess "substantial similarity."  See Apple Computer, 35 F.3d at 1446 (party claiming infringement "may place no reliance upon any similarity in expression resulting from unprotectable elements"); Cavalier, 297 F.3d at 822.  After all of the unprotected elements are filtered out, the extrinsic test focuses on whether there are "articulable similarities between the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works."  Kouf, 16 F.3d at 1045 (finding no substantial similarity between two works featuring a method of shrinking humans in size, and depicting "a life struggle of kids fighting insurmountable dangers."); Gold Glove Prods., LLC v. Handfield, 648 Fed. Appx. 679, 680-81 (9th Cir. 2016) (extrinsic test

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1 | not met where "setting, mood, and pace of [the works] are obviously different, as is
2 | the dialogue").

### a.   Any Similarities Between The Manuscript and The Film Are Outside The Scope Of Copyright Protection.

5 | In filtering out unprotectable material, "it is an axiom of copyright law that the
6 | protection granted to a copyrighted work extends only to the particular expression of
7 | the idea and never to the idea itself." Sid & Marty Krofft Television Prods., Inc. v.
8 | McDonald's Corp., 562 F.2d 1157, 1163 (9th Cir. 1977); Harper & Row Publishers,
9 | Inc. v. Nation Enters., 471 U.S. 539, 547 (1985) ("no author may copyright facts or
10 | ideas"); 17 U.S.C. § 102.  Similarly, the scenes à faire doctrine holds that forms of
11 | expression that are "standard, stock, or common to a particular subject matter or
12 | medium are not protectable under copyright law."  Satava v. Lowry, 323 F.3d 805,
13 | 809 (9th Cir. 2003); accord Apple Computer, 35 F.3d at 1443 ("similarities derived
14 | from the use of common ideas cannot be protected; otherwise, the first to come up
15 | with an idea will corner the market").  "Familiar stock scenes and themes that are
16 | staples of literature" – the ideas or scenes that flow naturally from other ideas or
17 | basic plot premises – are not protected by copyright.  Cavalier, 297 F.3d at 823.

18 | Ninth Circuit cases make clear there can be "no monopoly" on such
19 | unprotectable elements.  Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1082 (9th
20 | Cir. 2000).  See Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985) (no
21 | protection for idea of "criminal organizations that murder healthy young people, then
22 | remove and sell their vital organs to wealthy people in need of organ transplants" and
23 | a young professional who investigates and exposes the criminals); Olson v. NBC,
24 | 855 F.2d 1446, 1450 (9th Cir. 1988) (common idea like a "group action-adventure
25 | series designed to show Vietnam veterans in a positive light" not protectable); Rice
26 | v. Fox Broad. Co., 330 F.3d 1170, 1176 (9th Cir. 2003) (no similarity between two
27 | shows about magic tricks because "there are only a discrete number of ways to
28 | express a magician revealing the secrets behind magic tricks and illusions while

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

disguising his identity."); <u>Gold Glove</u>, 648 Fed. Appx. at 680-81 ("shared themes" of "father-daughter reconciliation, the breaking down of emotional barriers, the importance of family, and pitting old school ways against new ones" are "commonplace in father-daughter stories and in sports movies"); <u>8th Wonder Entm't, LLC v. Viacom Int'l, Inc.</u>, 2016 WL 6882832, at *5 (C.D. Cal. Nov. 22, 2016) (filtering out as unprotectable "the general idea of a reality television show about women in relationships with famous individuals; a reality television show about the families of hip hop artists; the factual biographies of [show participants]; general themes of relationship difficulties, legal challenges, troubled family dynamics, female friendships, and the burdens of the lifestyles of the rich and the famous.").

Here, Plaintiff's FAC does not identify <u>any</u> similarities between the Manuscript and the Film. Nor are any similarities apparent, apart from generic ideas or stock elements that would be common to innumerable works.

For example, the fact that both works involve the notion of "resurrecting" humans from the dead cannot be the basis for a copyright claim. The idea of resurrection dates back to the Bible, and also is prevalent in many other religious and mythological works. RJN 3, 5. Bringing the dead back to life also is a long-standing staple of horror, fantasy and science fiction works, depicted and explored in innumerable fictional books, movies and televisions programs, long before Plaintiff's Manuscript: most obviously, the story of "Frankenstein" (both the 1818 book and the 1931 movie) has been recrafted innumerable times, and at its core, is a story about resurrection. In more recent times, horror films like "Pet Sematary" (1983), "Flatliners" (1990), and countless zombie movies, among others, have explored the possibilities of resurrecting the dead. RJN 6.

Nor can Plaintiff claim the exclusive right to invoke the name "Lazarus" in references to resurrection. As Plaintiff recognizes in his own work, Lazarus was a biblical figure "whom Jesus miraculously raised from the dead." Manuscript, Ex. 1, p. 2 (explaining origin of title "Lazarui Taxa"); <u>see</u> RJN 3. Not surprisingly,

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

therefore, the name "Lazarus" is used commonly in connection with bringing something back to life, metaphorically[8] or otherwise; it has been used in innumerable expressive works over a period of decades, long before Plaintiff claims to have authored the Manuscript.[9]

Consequently, the fact both the Film and the Manuscript titles contain a reference to Lazarus is not surprising; it also does not provide any basis for a copyright claim.  It is well established that "titles are not protected by copyright law."  Silas, 201 F. Supp. 3d at 1182, citing Shaw v. Lindheim, 919 F.2d 1353, 1362 (9th Cir. 1990).  Moreover, although "identical titles can be circumstantial evidence" of copying, that inference does not apply where, as here, the titles are not identical.  Silas, 201 F. Supp. 3d at 1182.  And where the word in a title comes from another expressive work – the Bible – it can hardly be appropriated by Plaintiff as his own original expression.

### b.   None of the Works' Protectable Elements Are Substantially Similar.

After all of the non-protectable elements are filtered out, the Court must compare what is left, to evaluate whether there are substantial similarities.  Here, after removing the unprotected "idea," generic and previously-used elements, and

---

[8] Another judge in this district even invoked the biblical Lazarus in discussing the "legal resurrection" of a recalcitrant witness by that name.  In re Lazarus, 276 F. Supp. 434, 448-49 (C.D. Cal. 1967) ("[t]he Lazarus of the Bible had no control over his death [or] return to life.  But here this latter day Lazarus is the master of both his judicial death and his legal resurrection.  By his own choice he is asking for the mausoleum of the penitentiary to which the Court is about to commit him; yet he holds the key to the door which he need not but wants to enter.  All he has to do is talk.").

[9] See RJN 5.  In fact, a medical occurrence known as "the Lazarus Phenomenon," in which clinically dead humans demonstrate spontaneous signs of life, was reported in the medical literature more than twenty-five years ago.  RJN 4; See In re Ohio Execution Protocol Litig., 2017 WL 378690, at *30 (S.D. Ohio Jan. 26, 2017) (noting expert testimony on "Lazarus Phenomenon, in which "brain-dead humans have demonstrated spontaneous movement or movement in response to noxious stimuli by sitting up in bed, crossing their arms over their chest, or turning their head").

13

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

general plot devices, it is clear that the two works are <u>not</u> substantially similar – or even remotely similar.

Notably, Plaintiff's FAC does not identify anything he claims is substantially similar between the two works; he simply alleges his "suspicions" about "the possibility" of similarities.  FAC ¶¶ 27, 28(a).  This type of speculative pleading is insufficient to state a claim.  <u>Twombly</u>, 550 U.S. at 555, 557.  But beyond this pleading deficiency, a comparison of the two works' extrinsic elements ("plot, themes, dialogue, mood, setting, pace, characters, and sequence of events," <u>Kouf</u>, 16 F.3d at 1045) reveals that there are <u>no</u> protectable similarities.  Consequently, Plaintiff cannot cure the defects in his claim by amending his complaint a second time; thus, dismissal should be with prejudice.  <u>See</u> <u>Chaset v. Fleer/Skybox Int'l</u>, 300 F.3d 1083, 1087-88 (9th Cir. 2002); <u>Heusey</u>, 2015 WL 12765115, at *3 ("[i]f a plaintiff fails to establish substantial similarity, a court may grant a motion to dismiss with prejudice.").  Defendants address each of the extrinsic elements in turn.

**<u>Plot and Sequence of Events:</u>**

In evaluating substantial similarity, "plot is defined as the 'sequence of events by which the author expresses his theme or idea' that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works."  <u>Zella</u>, 529 F. Supp. 2d at 1135, <u>quoting</u> 4 Nimmer on Copyright § 13.03[A][1][b], at 13–42 (2003).  "[G]eneral plot ideas are not protected by copyright law[.]"  <u>Berkic</u>, 761 F.2d at 1293.  Instead, the substantial similarity test compares "the actual concrete elements that make up the total sequence of events and the relationships between the major characters," <u>Berkic</u>, 761 F.2d at 1293, based on "the actual objective details of the works."  <u>Silas</u>, 201 F. Supp. 3d at 1173; <u>accord</u>, <u>Kullberg</u>, 2016 WL 7324155, at *2 (while works shared "the general premise of an atheist professor challenging a Christian student's religious beliefs," the plots were not substantially similar because they "tell materially different stories").

DEFENDANTS' MOTION TO DISMISS
4846-9547-3477v.7 0103245-000004

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Here, the plots of the Manuscript and Film are entirely different, both overall and with respect to concrete, objective details.  As noted above, Plaintiff's work is a quintessential murder mystery, involving two detectives working for the "newly-formed Necrocide unit" in a frantic search for a serial killer.  Section III.A, supra; Manuscript, Ex. 1, p. 9.  The killer is murdering random Necrosapiens "in a most methodical and somewhat ritualistic way." Id. p.16.  Through much of the script, the detectives are frustrated in their efforts to solve the crime; although they ultimately figure out the killer's pattern of selecting victims, and are able to predict where he might strike next, id. p. 45, they spend much of the book chasing a string of innocent suspects, unhelpful witnesses, and bad leads.  With the help of a newspaper reporter and a forensics expert, the detectives stumble on cryptic riddles (id. pp. 63-67) that eventually cause them to take an unauthorized flight to Louisiana, where a mystical voodoo priestess provides additional clues.  Id. pp. 91, 97.  The detectives then predict where the killer will strike next, and using a cooperative Necrosapien as "bait," lure the killer into a trap.  Id. p. 133.  He attacks, killing the Necrosapien and seriously injuring Detective Ellion, before he is shot dead.  The "plot twist" is that the killer turns out to be a Necrosapien himself, although his motive for killing other Necrosapiens is never explained.  Id. p. 146.

The Film is not a detective story at all.  Its plot covers completely different events; and although there is a killer, her identity – unlike the killer in the Manuscript – is never a mystery.  The Film is a quintessential horror movie, set almost entirely in a medical research laboratory.  It begins with Frank, Zoe and two other researchers attempting unsuccessfully to reanimate a pig, with an eager graduate student filming their efforts.  Soon after, their experiment succeeds with a dog.  Film, Ex. 2, 13:55.  Frank and Zoe take the resuscitated dog home, where it shows signs of unusual, creepy behavior.  The next day, when they arrive at the university, Frank is called to the dean's office, and is told the project has been terminated, ostensibly because the unauthorized experiment violated the terms of

Frank and Zoe's grant.  Id. at 25:00.  While Frank is in the dean's office learning the bad news, the new owner of the biotechnical corporation that had been sponsoring the research sends minions to seize the lab equipment and research material, claiming ownership of the intellectual property.  Id. at 27:11.  That night, the researchers, aided by the grad student, surreptitiously enter the lab, determined to duplicate and record their experiment to prove their thesis and claim credit for the discovery.  Id. at 28:34.

The remainder of the Film – and most of its running time – takes place entirely in the lab.  After Zoe's accidental electrocution, a distraught Frank uses the project serum to resurrect her.  Id. at 36:00.  The regeneration leaves her with bizarre supernatural powers, and the realization that she is doomed to perpetually relive a childhood trauma.  After clairvoyantly sensing that her colleagues are sorry that they brought her back to life, she unleashes her new powers on them, killing each of them in a horrific manner.  See, e.g., id. at 58:40.

Even a casual review of these two works demonstrates the Manuscript and Film have virtually no similarities, apart from the basic idea of human resurrection.  That idea is not protected.  See supra, § IV.B.2.a.  But even the description of "reanimation" is different in the two works.  In the Film, the reanimation process is described as "bonding fast growth b-cell tumors which sped up the nerve fiber regrowth, creating the 'Lazarus serum,'" which is then injected into the subject's brain with a stimulating "pulsar" – but the process only works after the researchers realize they must introduce "a potassium-selective insulator into the serum."  Film, Ex. 2, 4:40, 11:50.  In the Manuscript, the method of reanimation is not described so fulsomely, but it is different: it involves implanting a "bio-silicon micro-processor" chips containing uranium, which leaves a tattoo-like marking on the subject's earlobe, making it possible to identify Necrosapiens.  Manuscript, Ex. 1, pp. 43-44.  And reanimation has substantially different effects on the subjects in the two works.  In the Manuscript, Necrosapiens are everywhere; they generally live commonplace

DEFENDANTS' MOTION TO DISMISS
4846-9547-3477v.7 0103245-000004

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

lives, although they sometimes are subjected to discrimination; in the Film, the only reanimated subject becomes supernatural, and in the course of a single night, murders everyone around her.

The only other commonalities between plots are basic narrative features that are too generic to qualify for copyright protection.  Plaintiff cannot, for example, base an infringement claim on the fact that both works involve dream sequences: dreams are a common narrative device in fictional works as diverse as "The Wizard of Oz," Fellini's "8 ½," and the "The Big Lebowski."  RJN 8.  Moreover, the dreams depicted in the two works at issue are not substantially, or even remotely, similar.  In the Film, Zoe has a recurring nightmare – repeated six separate times in the course of the movie – in which she relives a traumatic apartment fire she experienced as a child (and ultimately is revealed to have caused).[10]  The Manuscript also contains dreams, but they are not recurring, and are about completely different subjects.  See Manuscript, Ex. 1, pp. 82-84 (Detective Ellion dreams about her mother's death, and her agonizing over the family's decision not to resurrect her); id. pp. 92-93 (Detective Dobbs dreams about his missing wife, whom he believes is dead – but who turns out to be alive).

An infringement claim also cannot arise from commonplace abstract plot lines, such as protagonists disobeying their superior's orders.  See Manuscript, Ex. 1, pp. 75-78 (detectives continue their investigation after being told by superior to stop, because FBI has taken over the investigation); Film, Ex. 2, 25:00, 28:34 (researchers return to the lab to preserve their work after the university cancels their grant).  This also is a common plot device.  RJN 9.  Such "general" plot elements are unprotected. Berkic, 761 F.2d at 1293; see also Funky Films, Inc. v. Time Warner Entertainment Co., 462 F.3d 1072, 1081 (9th Cir. 2006) (no substantial similarity even though "both works share certain plot similarities").  Where, as here, the plots are so

---

[10] See Film, Ex. 2, at 9:43, 39:57, 47:25, 49:40, 54:44, 1:12:30.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

completely divergent in their "actual concrete elements," <u>Berkic</u>, 761 F.2d at 1293, there is no substantial similarity.

**Setting:**

The setting of the two works is entirely different, both physically and temporally.  Plaintiff's Manuscript takes place in the fictional city of New Athens, in or around the year **2096** – decades into the future.  Manuscript, Ex. 1, pp. 4, 7, 79. Detectives Dobbs and Ellion track a serial killer in a roving quest for clues at various sites across the city, including going to an abandoned fish warehouse by the docks where one of the murders took place (<u>id</u>. p. 7); an "industrial part of town" to confront a suspect (<u>id</u>. p. 27); another crime scene in a bustling urban square (<u>id</u>. 39); the "Straits" neighborhood (<u>id</u>. p. 56); a private mental hospital (<u>id</u>. pp. 112-15); and a city park (<u>id</u>. p. 143), among others.  The detectives and a reporter also travel to Louisiana, a three-hour flight from New Athens, where they visit an unnamed city and travel to the bayou.  <u>Id</u>. pp. 79, 88, 90.  Numerous other scenes are set in the police station, coroners' office, and characters' apartments.

The Film is set in Berkeley, California, in what appears to be the present day. Film, Ex. 2, 3:12.  Unlike the sprawling settings in the Manuscript, the Film is confined largely to two locations – the university research lab, and (briefly) the apartment shared by Frank and Zoe.[11]  The final 48 minutes of the 78-minute Film takes place entirely in the lab.  <u>Id</u>. at 29:26 to 1:17:10.

**Pace**:

This extrinsic element considers the works' "timeline." <u>Silas</u>, 201 F. Supp. 3d at 1181.  Here, too, the works are not at all similar. Although the Manuscript's exact timeline is not stated, the story appears to unfold over weeks or months, and portions

---

[11] The only other setting is the University dean's office, where – in a scene lasting just 78 seconds – Frank learns the project is being shuttered.  Film, Ex. 2, 25:00.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

of the work recount events dating back to the dawn of human resurrection, about 16 years before the events of the main storyline.

In contrast, the Film takes place over two days and two nights.  The vast majority of the action – from the time the researchers return to the lab to recreate their experiment, until the end of the Film – takes place in a single fateful night.

**Theme and Mood:**

The Manuscript focuses on two detectives' attempt to solve a perplexing crime.  It has the mood of a typical murder mystery, with the suspense based largely on the protagonists' attempt to puzzle out clues and find the motives and identity of the killer.

The Film, in contrast, has the mood of a classic horror film.  The first portion of the movie builds the tension, with teasers that suggest peril but leave the characters unharmed.  E.g., Film, Ex. 2, at 17:00 (resuscitated dog looming menacingly over Zoe as she sleeps); id. at 23:24 (characters perplexed by food missing off of top shelf, suggesting reanimated dog could levitate).  After Zoe is resurrected, the terror mounts as the other characters first realize she has dangerous new powers, then find themselves trapped in the lab; then one by one, each of the characters is killed in a gruesome manner.

Although both works address issues related to death and resurrection, even this is not done in a way that involves overlapping protected expression.  Any work premised on the possibility of bringing the dead back to life naturally will include some discussion about the implications of doing so, but that is not enough to establish substantial similarity.  "[T]here is no protection for … themes that flow necessarily from a basic premise."  Silas, 201 F. Supp. 3d at 1180, citing Olson, 855 F.2d at 1451 and Cavalier, 297 F.3d at 823; see also Handfield, 648 Fed. Appx. at 680-81 ("commonplace" themes such as "father-daughter reconciliation, the breaking down of emotional barriers, the importance of family, and pitting old school ways against new ones" are "not original, protectable elements"); 8th Wonder Entm't,

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  LLC, 2016 WL 6882832, at *6 (general themes such as "knowing when to let love

2  go" not protectable).

3      In any event, the works at issue here address the implications of resurrection in

4  entirely dissimilar ways.  The premise of the Manuscript is that reanimation can

5  become normalized: whether it is right or wrong is debated by cable news panels (Ex.

6  1, p. 25), and Necrosapiens face discrimination (id. 6, 52), but the process itself has

7  become routine.  In the Film, however, even the possibility of resurrection is

8  confidential, subject to secrecy agreements (Ex. 2, 3:50, 14:50).  And it is far from

9  routine:  only a single human being has undergone the process, and it ends in horrific

10  calamity.

11  **Dialogue:**

12      Copyright law does not protect "fragmentary words and phrases" or "forms of

13  expression dictated solely at functional considerations."  Stern v. Does, 978 F. Supp.

14  2d 1031, 1040 (C.D. Cal. 2011) (citation omitted), aff'd sub nom. Stern v. Weinstein,

15  512 Fed. Appx. 701 (9th Cir. 2013).  Accordingly, "for a plaintiff to demonstrate

16  substantial similarity of dialogue, it must show 'extended similarity of dialogue.'"

17  Silas, 201 F. Supp. 3d at 1181, quoting See Olson, 855 F.2d at 1450; accord, Heusey,

18  2015 WL 12765115, at *7.

19      Here, Plaintiff does not even allege that the Film contains any dialogue similar

20  to that in his Manuscript, nor could he plausibly do so.  Comparing the Manuscript

21  and the Film makes clear that the dialogue is not the same.

22  **Characters:**

23      There is virtually no overlap, much less "substantial similarity," between any

24  character in the Film and any in the Manuscript.  Indeed, Plaintiff cannot show any

25  character in his work is so unique as to be copyrightable; but even if he could meet

26  this high standard, it is plain from the face of the works that the characters in the

27  Film are quite different from those in the Manuscript.

28

DEFENDANTS' MOTION TO DISMISS
4846-9547-3477v.7 0103245-000004

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

As an initial matter, characters are not copyrightable under Ninth Circuit law unless they are "sufficiently delineated" and "especially distinctive." DC Comics v. Towle, 802 F.3d 1012, 1021 (9th Cir. 2015). Moreover, "[w]hen analyzing whether two protectible characters are substantially similar, courts require *a very high degree of similarity* between characters." Silas, 201 F. Supp. 3d at 1177 (emphasis added). "[O]nly protectible elements standing alone may be compared when determining substantial similarity." Id., citing Cavalier, 297 F.3d at 822. Mere similarity in general character traits is insufficient. Silas, 201 F. Supp. 3d at 1177, 1179 (finding no substantial similarity between characters that "are both well-dressed football players who are sexually promiscuous, drive fancy cars, and have a cocky attitude."). Similarity must lie in the characters' concrete attributes, and even minor differences in occupation or romantic status can defeat claims of similarity. Id. at 1178 (similarity defeated in part by fact one character was an active professional football player who owns a nightclub, and the other was a retired professional football player who worked for a financial management company).

The Manuscript's central characters are the two detectives. Dobbs is a rumpled and jaded 40-something veteran of the force, prone to rule-bending and heavy drinking. Manuscript, Ex. 1, pp. 8, 59. His younger female partner, Ellion, is his polar opposite: "If he was Yin, she was definitely Yang; young, clean, and orderly." Id. p. 8. These are stock characters. See, e.g., Walker v. Time Life Films, Inc., 784 F.2d 44, 49-50 (2d Cir. 1986) (in works about NYPD, depiction of central characters as "third- or fourth-generation Irish policemen who live in Queens and frequently drink" not protectable). And to the extent the Manuscript's characters have any "especially distinctive" attributes as required to merit copyright protection at all, it is readily apparent that they are not copied in the Film. The Film's two central characters – Frank and Zoe, the project directors – are medical researchers, not detectives. They are engaged to be married (in contrast to detectives Dobbs and

21

Ellion, who display no romantic interest in each other; each of the detectives has other romantic interests who are peripheral characters).

The Film has only three other central characters. Joining Frank and Zoe in the lab are two additional researchers – brilliant but obnoxious Clay, who has a penchant for vaping in the lab; and Niko, who is vaguely suggested as having had a romantic past with Zoe that he has never quite gotten past. They are joined by Eva, a pretty young videographer and university student who is making a documentary about the project.[12] None of these characters bears any resemblance to any character in the Manuscript, much less with the "very high degree of similarity" in distinctive elements required to show substantial character similarity.

In sum, a review of the two works demonstrates the Film is exceedingly different from the Manuscript with respect to every extrinsic element. Because Plaintiff cannot show that the two works have substantial similarity of protectable expression, his copyright claim fails as a matter of law, and should be dismissed with prejudice.

### V.   CONCLUSION

For all the reasons set forth above, this Court should dismiss Plaintiff's Amended Complaint with prejudice, and should award Defendants their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505, in an amount to be determined on a subsequent motion.

DATED:  April 7, 2017              DAVIS WRIGHT TREMAINE LLP
                                   KELLI L. SAGER
                                   ERIC M. STAHL
                                   DIANA PALACIOS


                                   By:_____/s/ Kelli L. Sager_____
                                         Kelli L. Sager
                                     Attorneys for Defendants

---

[12] The Film has only eight other credited characters, including a dog. Film, Ex. 2, at 1:17:45 (cast credits). None of the human characters appears on screen for more than 80 seconds.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899