1
2
3
4
5
6
7

JS-6

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10   CHRISTOPHER "CHRIS" WAYNE         Case No.  2:16-cv-04348-AB-SS
     FILLMORE, an individual,
11                                     **ORDER GRANTING MOTION TO**
                  Plaintiff,           **DISMISS**
12
13   vs.

14   BLUMHOUSE PRODUCTIONS,
     LLC, and JEREMY SLATER,
15
                  Defendant.
16

17        Before the Court is Defendants Blumhouse Productions, LLC and Jeremy

18   Slater's (collectively "Defendants") Motion to Dismiss Plaintiff's First Amended

19   Complaint and Request for Judicial Notice in Support of Motion to Dismiss.

20   ("Motion" and "RJN," Dkt. Nos. 51 and 51-1).  Plaintiff filed an opposition and

21   Defendants filed a reply.  (Dkt. Nos. 56, 63.)  Upon consideration of the parties'

22   arguments and the case file, the Court hereby **GRANTS** the Motion.

23   **I.    BACKGROUND**

24        Plaintiff's First Amended Complaint ("FAC," Dkt. No. 43) alleges as follows.

25   Between 2004 and 2005, Plaintiff wrote an original manuscript entitled "Laza[u]ri

26   Taza" ("Manuscript").  FAC ¶ 22.  In 2006, Plaintiff registered his Manuscript with

27   the United States Copyright Office; Plaintiff did not release his Manuscript to the

28

1    public before it was registered.  *Id.* ¶ 23.  From 2006 to 2013, Plaintiff allegedly

2    submitted either portions of the manuscript or its entirety to various talent agents,

3    literary agents, management companies and publishers throughout the United States,

4    and made it commercially available through the "print on demand" publisher

5    "lulu.com."  *Id.* ¶ 25.  Plaintiff also contends that he distributed either electronic or

6    hard copies of his manuscript to pay-for-critique services, family, friends, associates,

7    and one editor for hire.  *Id.*

8         Plaintiff learned of Defendants' film "The Lazarus Effect" ("Film") in February

9    2015 via the Film's advertisements.  *Id.* ¶ 26.  On February 27, 2015, Plaintiff

10   attended a pre-release screening of the Film and became suspicious that it was

11   substantially similar to his Manuscript  *Id.* ¶ 27.  Plaintiff alleges that after thoroughly

12   comparing the two works and recognizing similarities between the two, he gave

13   written notice to Defendants in December 2015 and January 2016, which purportedly

14   addressed his suspicions and asserted that the similarities between the two works

15   constitutes infringement of Plaintiff's copyright  *Id.* ¶¶ 28-30.  Defendants refuted

16   Plaintiff's accusations, and Plaintiff filed this action.  *Id.* ¶ 31.

17        Plaintiff asserts that numerous and significant similarities between his

18   Manuscript and Defendants' Film demonstrate that Defendants copied his Manuscript

19   in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. § 1338.  *Id.*

20   ¶¶ 1, 33.  Additionally, Plaintiff contends that Defendants infringed his copyright

21   willfully, intentionally, purposefully, and in disregard of and with indifference to said

22   copyright.  *Id.* ¶ 34.  Accordingly, Plaintiff argues that he is entitled to statutory

23   damages, or, in the alternative, an award to be proven at trial.  *Id.* ¶¶ 35, 38.  Plaintiff

24   also claims that he is entitled to the profits Defendants obtained from the infringement

25   in accordance with 17 U.S.C. § 504(b).  *Id.* ¶ 36.  Lastly, Plaintiff asserts that he has

26   and will continue to suffer substantial and irreparable injury for which there is no

27   adequate remedy at law.  *Id.* ¶¶ 37-38.  For that reason, Plaintiff requests permanent

28   injunctive relief to enjoin and restrain Defendants from continuing to infringe upon his

1    copyright. *Id.* ¶¶ 37-38.

2           Defendants move for dismissal on the grounds that Plaintiff cannot plead or

3    prove copying because (1) Plaintiff is unable to prove Defendants had access to

4    Plaintiff's unpublished manuscript , (2) the Manuscript is not substantially similar to

5    Defendants' feature film "The Lazarus Effect," and (3) Plaintiff is therefore unable to

6    plead a claim for copyright infringement. Concurrently, Defendants request judicial

7    notice of the contents of the Manuscript and Film at issue as well as generic literary

8    and cultural elements commonly employed in literature.

9    **II.   LEGAL STANDARD**

10          Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to provide a "short

11   and plain statement of the claim showing that the pleader is entitled to relief."

12   Although a plaintiff need not provide detailed factual allegations in the complaint, "a

13   plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

14   more than labels and conclusions, and a formulaic recitation of the elements of a cause

15   of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 555 (2009) (alteration in

16   original).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's claim must be

17   more than a suspicion; the "[f]actual allegations must be enough to raise a right to

18   relief above the speculative level." *Id.*

19          In deciding a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken

20   as true and construed in the light most favorable to the nonmoving party." *Sprewell v.*

21   *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citing *Enesco Corp. v.*

22   *Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998).  Accordingly, for a defendant

23   to be successful in a Rule 12(b)(6) motion, there must either be (1) a "lack of a

24   cognizable legal theory," or (2) "the absence of sufficient facts alleged under a

25   cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

26   Cir. 1990).

27          The Court may "consider materials—documents attached to the complaint,

28   documents incorporated by reference in the complaint, or matters of judicial notice—

without converting the motion to dismiss into a motion for summary judgment."[1] *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Importantly, the Court can consider materials that are not "physically" attached to the complaint at issue but "whose contents are alleged in [the] complaint and whose authenticity no party questions." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

Courts in the Ninth Circuit have applied this legal standard to resolve motions to dismiss copyright claims, allowing defendants to introduce the copyrighted work and the infringing work that were not included but referenced in the complaint. *See Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1168 (C.D. Cal. 2016) (taking judicial notice of a motion picture trailer, a shortened trailer, a screenplay, a treatment and the *Ballers* television series that were all referenced in the plaintiff's complaint but not attached). Courts "may [also] take judicial notice of generic elements of creative works" and elements common to a genre. *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007). Additionally, the Court may compare and examine the two works in question and determine "non-infringement" on a Motion to Dismiss. *Puckett v. Hernandez*, 2016 WL 7647555 at *18 (C.D. Cal. 2016) (holding that a comparison of the lyrics of the two works at issue is appropriate on a 12(b)(6) motion to dismiss the copyright claim); *Gadh v. Spiegel*, 2014 WL 1778950 at *7 (C.D. Cal. 2014) ("For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint.") (citing *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.")).

---

[1] Plaintiff argues that under Fed R. Civ. Proc. 12(d), the Court cannot consider the two works or Defendants' other requests for judicial notice without converting Defendants' motion into one for summary judgment. However, this is contrary to long-standing black-letter law as stated in *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) and *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003).

1  **III.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

2          In support of their motion, Defendants seek judicial notice of the two works, of

3  certain facts not subject to reasonable dispute, and of a number of generic literary

4  elements, pursuant to Fed. R. Evid. ("Rule") 201.

5          For the following reasons, the Court **<u>GRANTS</u>** the Defendants' requests for

6  judicial notice.

7          **A. The Court Takes Judicial Notice of the Manuscript and the Film.**

8          Defendants submitted Plaintiff's Manuscript and a DVD of the Film for the

9  Court's review.  *See* RJN 1:5-1; Stahl Decl. (Dkt. No. 51-2) ¶¶ 2, 4, Exhs. 1 and 2.

10  Although neither work is attached to the FAC, the FAC refers to them extensively so

11  they may be considered in deciding this motion.  Furthermore, there is no dispute that

12  the Manuscript and the DVD Defendants submitted are true and correct copies.  These

13  materials are therefore judicially noticeable under Rule 201.  The Court briefly

14  summarizes  Plaintiff's Manuscript and Defendants' Film.

15          **1.  <u>Plaintiff's Manuscript</u>**

16          Plaintiff's Manuscript  is a murder mystery about two detectives who try to

17  solve a case involving a serial killer who is targeting reanimated corpses, or

18  "Necrosapiens." The story depicts how scientific advances and the widespread

19  practice of reanimation has affected society at large. Throughout the Manuscript, the

20  detectives work to find the person responsible for the killings. The story ends with the

21  discovery of the serial killer's identity.

22          **2.  <u>Defendants' Film</u>**

23          The Defendants' Film is a science-fiction horror movie about a group of

24  university medical researchers who have designed a serum that allows doctors to save

25  more lives by stopping neural degeneration in coma patients and lengthening the

26  temporal opportunity to revive patients in cardiac arrest. They discover that their

27  serum has the power to bring animals back to life. After one of the researchers, Zoe, is

28  fatally electrocuted in the course of an experiment, the research team uses the serum

to bring her back to life. Once reanimated, Zoe begins to have supernatural powers such as the ability to read minds and move objects or people with great force. After being trapped in hell during the short period between her death and reanimation, Zoe decides to kill the researchers responsible for her reanimation.

### B. The Court Takes Judicial Notice of Facts Not Subject to Reasonable Dispute and to Certain Generic Literary Elements.

Defendants request judicial notice of facts not subject to reasonable dispute and to certain generic literary elements. *See* RJN 1:10-24. These items are:

*Facts Not Subject to Reasonable Dispute:*

1. Lazarus is a biblical figure who, according to the New Testament, was raised from the dead by Jesus.
2. The term "The Lazarus Phenomenon" has been used in medical literature to describe an occurrence in which clinically dead humans demonstrate spontaneous signs of life.
3. The name Lazarus has been used in numerous expressive works regarding death and resurrection.

*Generic Literary Elements*:

1. The possibility of resurrection is a common element in religious works.
2. Bringing the dead back to life is a common element in horror, fantasy and science fiction books and movies.
3. Dream sequences are a common narrative device in works of fiction.

Because the determination of copyright infringement requires an examination of the actual works themselves and a finding of substantial similarity between Plaintiff's protected expression and Defendants' Film, the Court may take judicial notice of the two works as well as generic literary elements and undisputable facts related thereto. *Zella*, 529 F. Supp. 2d at 1129. The Court has considered the proffered facts and

1   literary elements and finds that they are not subject to reasonable dispute because they
2   are generally known within the court's jurisdiction.  *See* Fed. R. Civ. P. 201(b)((1).
3   The Court therefore takes judicial notice of the listed facts and literary elements.

## IV.     DISCUSSION

### A. Pleading Copyright Infringement

6          To succeed in a copyright infringement claim, Plaintiff must show (1) he has
7   ownership of a valid copyright, and (2) Defendants copied protected elements of the
8   Manuscript that are original.  *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d
9   1072, 1076 (9th Cir. 2006) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499
10  U.S. 340, 361 (1991)).  Defendants do not dispute the first element: that Plaintiff owns
11  a valid copyright in his Manuscript.  They argue only the second element: that
12  Plaintiff cannot show that Defendants copied his Manuscript.

13         Unless Plaintiff presents direct evidence of copying, he must prove that
14  Defendants had "access" to his Manuscript and that his Manuscript and Defendants'
15  Film are substantially "similar."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477,
16  485 (9th Cir. 2000); *see also Bernal v. Paradigm Talent & Literary Agency*, 788 F.
17  Supp. 2d 1043, 1052 (C.D. Cal. 2010); *Funky Films*, 462 F.3d at 1072.

18         "In what is known as the 'inverse ratio rule,' [courts] 'require a lower standard
19  of proof of substantial similarity when a high degree of access is shown.'" *Three Boys*,
20  212 F.3d at 485 (citing *Smith,* 84 F.3d at 1218 ).  And, if the plaintiff cannot establish
21  access, he can still establish copying by showing that the works are "*strikingly*
22  similar." *Id.* (emphasis added).

23         Importantly, a high degree of access cannot eliminate the plaintiff's burden of
24  proving similarities between her work and the defendant's work.  As Plaintiff points
25  out, in deciding a motion to dismiss, the Court is not required to make an in-depth
26  evaluation of the facts in the case file or Defendants' access to Plaintiff's Manuscript.
27  Rather, the Court must analyze the purported substantial similarity between Plaintiff's
28  Manuscript and Defendants' Film.  "No amount of proof of access will suffice to

show copying if there are no similarities." *Sid & Marty Kroft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977).  If Plaintiff is unable to allege facts sufficient to establish substantial similarity between Plaintiff's Manuscript and Defendants' Film, Defendants' Motion to Dismiss may be granted.

Here, Plaintiff does not claim that he has direct evidence that Defendants copied his Manuscript.  Rather, he alleges that Defendants had the opportunity to access his Manuscript and that the Manuscript and the Film are substantially similar.

### B. The Complaint Pleads Facts that Would Show that Defendants Had, *At Most,* a Slight Possibility of Access to the Manuscript.

Proof of access requires proof of "an opportunity to view or to copy plaintiff's work." *Sid & Marty Kroft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977).  The Ninth Circuit has often determined "opportunity to view" in light of a defendant's reasonable potential to view a plaintiff's work. *Three Boys*, 212 F.3d at 482 (quoting *Jason v. Fonda*, 526 F. Supp. 774 (C.D. Cal. 1981), *aff'd,* 698 F.2d 966 (9th Cir. 1983)).  Access cannot be inferred from Plaintiff's "mere speculation or conjecture." *Three Boys*, 212 F.3d at 482 (quoting 4 Nimmer, *Nimmer on Copyright* § 13.02[A], at 13-19 (2003)).  Instead, Plaintiff must show a "reasonable possibility of viewing [his] work-not a bare possibility." *Id.*  Although the Court may consider circumstantial evidence of access, it is typically proven by either (1) a chain of events that link the plaintiff's work and defendant's access, or (2) proof that the "plaintiff's work has been widely disseminated." *Three Boys*, 212 F.3d at 482.

Plaintiff does not allege facts that would directly establish that Defendants accessed Plaintiff's Manuscript, nor does Plaintiff  allege that there is a chain of events that demonstrate Defendants' access to Plaintiff's Manuscript. Namely, Plaintiff does *not* allege that Plaintiff sent Defendants his Manuscript, Defendants purchased Plaintiff's Manuscript, or that another individual or group of individuals who possessed the Manuscript gave it to Defendants.  Instead, Plaintiff asserts that because Plaintiff's Manuscript was highly accessible and thus widely disseminated, an

inference of access can be made. Plaintiff points to the fact that his Manuscript (1) was sent to various talent agents, literary agents, management companies, publishers, friends, and family throughout the U.S., and (2) was commercially available from 2006-2013 on "lulu.com," to contend that the Manuscript can be considered widely disseminated.  FAC ¶¶ 24, 25.

The Ninth Circuit has previously stated that "although [they] recognize the power of the internet to reach a wide and diverse audience, [internet presence is not necessarily] sufficient to demonstrate wide dissemination." *Art Attacks Ink, LLC v. MGA Enter. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009).  "In most cases, the evidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums." *Loomis v. Cornish*, 836 F.3d 991 (9th Cir. 2016); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003).  For example, the Ninth Circuit has held that a video that sold 17,000 copies and a book that sold approximately 2,000 copies could not be considered widely disseminated.  *See Rice*, 330 F.3d at 1178 ("*The Mystery Magician* only sold approximately 17,000 copies between 1986 and 1999; therefore, the video cannot be considered widely disseminated,..");and *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981) (no more than "bare possibility" that defendants had access to a book that sold about 2,000 copies).  The FAC presents no factual allegations that Plaintiff's Manuscript was distributed or sold in a volume that exceeds that of the aforementioned works.  To the contrary, Plaintiff does not allege any sales at all.  Rather, he alleges only that he personally sent the manuscript to talent agents, literary agents, friends and family, and the like.  It is not plausible that Plaintiff's uncompensated distribution reached into the thousands of copies, let alone more than 17,000 copies, so he has not pled facts that could establish widespread dissemination sufficient to support an inference of access.

The Court has found one case with facts somewhat analogous to those of the current action. In *Mestre v. Vivendi Universal U.S. Holding Co.,* 2005 WL 1959295

9.

1   (D. Or. Aug. 15, 2005), *aff'd*, 273 F. App'x 631 (9th Cir. 2008), Plaintiff alleged that

2   distributing his screenplay to approximately 211 individuals who were described as

3   "extremely well-connected in the film industry" constituted wide dissemination.

4   *Mestre,* 2005 WL 1959295 *3.  However, the court found that even "with all

5   inferences drawn in light most favorable to plaintiffs, plaintiffs fail[ed] to establish a

6   reasonable inference of wide dissemination."  *Id.*  Importantly, the plaintiff's

7   screenplay had "gained no commercial success or notoriety."  *Id.* Likewise, Plaintiff's

8   allegations that he sent copies to agents, friends, and family cannot plausibly establish

9   that the Manuscript was disseminated widely. Therefore, there is no more than a bare

10   possibility that Defendants  had access to the Manuscript.

11          **C. The Works Are Not Substantially Similar.**

12          As noted above, depending on the degree of access a plaintiff proves, he can

13   establish copying by showing that the works are either *substantially* similar, or

14   *strikingly* similar.  Plaintiff cannot establish a high probability of access, so he must

15   satisfy the more demanding strikingly similar standard.  However, even if the less

16   demanding substantially similar standard applies, Plaintiff cannot satisfy it.

17          The substantial similarity test consists of an intrinsic component and an

18   extrinsic component.  *Funky Films*, 462 F.3d at 1077.  The intrinsic component

19   evaluates "an ordinary person's subjective impressions of the similarities between two

20   works" and therefore is a matter of fact for the jury.  *Id.*  The extrinsic component,

21   which determines whether or not substantial similarity between the works exists as a

22   matter of law, is therefore a question for the court. *Id.*   Both components are required

23   to establish substantial similarity.  *See Kouf  v. Walt Disney Pictures & TV*, 16 F.3d

24   1042, 1045 (9th Cir. 1994).  Therefore, if a plaintiff is unable to satisfy the extrinsic

25   component of the substantial similarity test, then the plaintiff is unable to show

26   substantial similarity as a matter of law.  *Id.*

27          For literary works, the extrinsic component requires a court to objectively

28   evaluate whether there are "articulable similarities between the plot, themes, dialogue,

mood, setting, pace, characters, and sequence of events." *Zella*, 529 F. Supp. 2d at 1133 (quoting *Funky Films*, 462 F.3d at 1077).  In analyzing the similarities between the two works, the Court must only consider *protectable* elements of expression. *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002).  Basic plot ideas or "situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* at 22.  Moreover, "[s]imilarities from the use of common ideas cannot be protected." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994).  Rather than a general idea, an author's unique manifestation of an idea is to be considered protectable expression. "[P]rotectable expression includes the specific details of an author's rendering of ideas." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).

The Court has reviewed the two works and the parties' positions, and finds as follows concerning the extrinsic component of the substantial similarity test.

### 1. <u>Setting, Plot and Sequence of Events</u>

The setting, plot, and sequence of events within the two works are not similar.

Where the setting of Plaintiff's Manuscript is the fictional city of New Athens, in the year 2096, Defendants' Film is a horror movie set in Berkeley, California, in the present day.

Plot is defined as "'the sequence of events by which the author expresses his theme or idea.'" *Zella*, 529 F. Supp. 2d at 1133 (quoting 4 Nimmer, *Nimmer on Copyright* § 13.03[A][1][b], at 13-42 (2003)).  Because "[g]eneral plot ideas are not protected by copyright law," the Court must instead consider the "actual concrete elements that make up the total sequence of events." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  The Ninth Circuit is "'particularly cautious [of finding substantial similarity] where [a] list [of perceived similarities] emphasizes random similarities scattered throughout the works.'" *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015) (quoting *Litchfield v. Spielberg*, 736 F. 2d 1352, 1356 (9th Cir. 1984)).

1      Plaintiff's Manuscript, a murder-mystery, depicts two detectives who work to
2  solve a string of murder cases. The scientific process of human reanimation is
3  widespread and as a result, newly reanimated humans, "Necrospaiens," are the subject
4  of hate crimes and discrimination. A serial killer is murdering newly reanimated
5  "Necrosapiens" at random. The majority of Plaintiff's Manuscript takes the reader
6  through the two detectives' crime solving process where they follow leads and
7  ultimately discover where the killer will strike next. Plaintiff's Manuscript ends with
8  an injured Detective Ellion, the death of the final victim, and the death of the killer
9  himself. The detectives discover that the killer is a Necrosapien, but his motive for
10  killing his fellow Necrosapiens is left a mystery.

11      In Defendants' Film, Researchers at a university laboratory have been looking
12  to find new methods of "arresting neural decay in coma patients."  Film, Ex. 2, at
13  25:23.  After one of the researchers, Zoe, is fatally electrocuted in the course of an
14  experiment, the rest of the researchers attempt to revive her using the "Lazarus" serum
15  that was previously successful in animal regeneration.  In contrast to Plaintiff's
16  Manuscript, the world that Defendants' Film depicts is one in which reanimation is
17  uncommon, if not unprecedented.  Because of the unknown consequences, the
18  characters are hesitant to bring their fellow researcher back to life, but ultimately go
19  through with the procedure.  The "Lazarus" serum gives Zoe the supernatural powers
20  to read minds, levitate, and move objects.  Stuck in what appears to be some sort of
21  Hell/Limbo, Zoe becomes possessed with an evil plan to kill her colleagues. The Film
22  ends when Zoe kills her last colleague and then attempts to reanimate her husband,
23  fellow researcher Frank.

24      Despite the foregoing, Plaintiff argues that (1) the technology used to reanimate
25  the deceased in Defendants' Film is substantially similar to the technology used in
26  Plaintiff's Manuscript, and (2) research in both stories was initially conducted on lab
27  animals before being executed on humans. These cited similarities flow naturally from
28  plots involving innovative research experiments and unprecedented human

1    reanimation. Therefore, such similarities are not protectable and cannot be a basis for

2    establishing copyright infringement.  *See Metcalf*, 294 F.3d at 1074 (9th Cir. 2002)

3    (holding copyright law does not protect scenes that flow naturally from unprotectable

4    plot premises).

5         Additionally, Plaintiff points to the scene in Defendants' Film where the

6    researchers' benefactors terminate their project and repossess the fruits of their labor.

7    Plaintiff claims that this is substantially similar to the point in Plaintiff's Manuscript

8    where the FBI repossesses the principal characters' investigation. While in

9    Defendants' Film the researchers' benefactors terminate the research project because

10   they want to capitalize on the researchers' intellectual gain, the detectives in

11   Plaintiff's Manuscript take over the serial-killer case in accordance with standard

12   protocol. Thus, the motives behind the researchers' benefactors are dissimilar to the

13   motives behind the detectives, and do not advance the plot in similar, protectable

14   ways.

15        Plaintiff also alleges that the plot twist at the end of Defendants' Film, where

16   Zoe attempts to reanimate Frank, "holds the same measure of ambiguity surrounding

17   the killer" as Plaintiff's Manuscript does when it promptly ends without identifying

18   the killer's motive.  Opp'n 8:17-18.  However, both works end in a way that is

19   attributable to their genre. Like many horror films, Defendants' Film ends with a

20   horrific open-ended possibility: namely, the audience is left to hypothesize whether

21   Zoe will be successful in her attempts to reanimate Frank, who then may become an

22   accomplice in her evil acts. In contrast, Plaintiff ends his Manuscript with a mystery

23   that remains unsolved: the serial killer's motive.  Although the reader discovers the

24   serial killer's identity, they are left to question his motive in typical mystery-genre

25   fashion.  The mere fact that both works end with "the same measure of ambiguity"  is

26   not sufficient to satisfy the substantial similarity test.  Instead, Plaintiff would have to

27   look to a lower level of generality, and allege that the ambiguous endings of the two

28   works are similar in *protectable* ways, such that Plaintiff's manifestation of "mystery

13.

endings" was infringed on.  For these reasons, the purported similarities between the works cannot be considered substantially similar for the purposes of establishing a copyright claim.

Lastly, Plaintiff contends that the moment in Defendants' Film where Frank sacrifices himself to Zoe is similar to the unintentional self-sacrifice of the female principal Detective Ellion in Plaintiff's Manuscript. Yet, while Zoe killed Frank during his attempt to fatally inject her with poison and put an end to her disastrous reanimation, Detective Ellion in Plaintiff's Manuscript was injured in the line of duty. Thus, even if there were two similar elements of "sacrifice" in the two plots, both manifestations of the general theme of sacrifice are unique and therefore not similar in protectable ways.

Plaintiff looks to a high level of generality for similarities between his Manuscript and Defendants' Film. The Court finds that the plot and sequence of events of the two works in question both follow the traditional plots of their respective genres, and are not unique manifestations of general literary elements. As noted, such similarities are not within the confines of protectable expression, and therefore do not establish extrinsic similarity between the two works.

### 2.  Theme

"[F]amiliar scenes and themes are among the very staples of modern American literature and film." *Berkic*, F.2d at 1294.  As such, they are not protectable expression and therefore do not give rise to a copyright infringement claim. *Id.*  "It merely reminds us that in Hollywood…there is only rarely anything new under the sun." *Id.*  If works present similar themes but do so in two distinct ways, the themes are not considered substantially similar under the substantial-similarity test. *Funky Films*, 462 F.3d at 1077.

Plaintiff concedes that the concept of "resurrection" is common among a number of literary works.  Yet, Plaintiff argues that there are several similarities between the themes of the two works.

1    First, Plaintiff believes that the fact that the Defendants also use the term

2 "Lazarus" in their Film establishes similarity between the two works. However, as

3 Defendants point out, and as this Court took judicial notice of, Lazarus is a well-

4 known biblical figure who was raised from the dead and brought back to life. *See* RJN

5 1:10-24. Similarly, the name "Lazarus" has long been widely used to symbolize

6 reanimation or signs of reanimation in the medical, religious, literary, and cinematic

7 world.  "Lazarus" is not a protectable term and the ideas that flow "necessarily from"

8 the term "Lazarus" are not protectable expression.  The theme of scientific

9 reanimation has been used numerous times in past literary works- Mary Shelley's

10 *Frankenstein* to name one.  That Plaintiff and Defendants both used this familiar

11 theme in their works does not establish that any protectable elements are similar.

12    Second, Plaintiff asserts that (1) the theme of "what happens beyond death?"

13 becomes a great motivation for the characters in both works, (2) the reanimated

14 characters in both works experience a heaven/hell scenario, (3) the characters in both

15 works consider what societal/religious implications reanimation brings, and (4) the

16 first animals to be successfully reanimated suffered adverse reactions from the

17 procedure. These themes can be said to "necessarily flow" from the term "Lazarus"

18 and the connotations that accompany it, and have also been present in various past

19 literary works. Therefore, these themes are not a basis for establishing extrinsic

20 similarity.

21    Plaintiff lastly contends that the two works share the theme of (1) dreams

22 surrounding and/or associated with a character's job, and (2) a man's motive to use

23 reanimation to resurrect his wife. But, as the Defendants point out, and as the Court

24 took notice of, a great number of past literary works across genres contain themes

25 involving dreams. Additionally, there are a number of past literary works that involve

26 a character who wants to preserve his wife's life. Because said themes in Plaintiff's

27 Manuscript and Defendants' Film had different substance, motivation, and literary

28 purpose, these common themes cannot establish extrinsic similarity in this instance.

15.

1

### 3. Mood

2     As noted, Plaintiff's Manuscript is a murder-mystery involving two detectives

3  who pursue a serial killer. The mood of Plaintiff's Manuscript reflects its genre: it is

4  suspenseful and serious, and builds as the detectives get closer to solving their case

5  and identifying the killer. Defendants' Film is a horror film and its mood also reflects

6  its genre: the mood quickly builds and remains suspenseful and horrific as Zoe

7  murders her colleagues in gruesome and intentionally startling ways. Although both

8  works aim to create a suspenseful mood for their respective audiences, general

9  suspense is not protectable expression and cannot establish the extrinsic similarity

10  necessary to support a copyright infringement claim.

11

### 4. Dialogue

12     Defendants have alleged that there are no similarities between the dialogue

13  present in Plaintiff's Manuscript and that of Defendants' Film. Plaintiff leaves this

14  uncontested. The Court has examined the dialogues and does not find that there are

15  similarities between the dialogue in Plaintiff's Manuscript and the dialogue in

16  Defendants' Film.

17

### 5. Pace

18     Defendants argue that the pace or timeline of the two works are dissimilar.

19  While Plaintiff's Manuscript develops along approximately months of an investigation

20  and often references back to events sixteen years in the past, Defendants' Film unfolds

21  in a matter of two days. With the exception of Zoe's dream that recounts a traumatic

22  moment in her childhood, Defendants' Film does not reference past events. Plaintiff

23  also leaves this uncontested. The Court finds that the pace of the two works are

24  dissimilar.

25

### 6. Characters

26     Characters may be protectable expression if they have "distinctive character

27  traits and attributes" that are "sufficiently delineated." *DC Comics v. Towle*, 802 F.3d

28  1012, 1021 (9th Cir. 2015).  When assessing whether or not two characters are

protectable and substantially similar, "courts require a very high degree of similarity between characters." *Silas*, 201 F. Supp. 3d at 1177.  Defendants argue that there are no protectable similarities between any character in Plaintiff's Manuscript and any character in Defendants' Film. Plaintiff, on the other hand, asserts that there are significant similarities between the characters in the two works.

The Court will take judicial notice of the following literary element at Defendants' request: a character disobeying a superior's orders is a common narrative device in works of fiction.

i. Antagonist

Plaintiff claims that the antagonist in both Plaintiff's Manuscript and Defendants' Film (1) engage in an indiscriminate killing spree and (2) are both adversely affected by reanimation. Such elements of a character are not distinctive enough to be properly considered protectable expression.

ii. Main Characters

Plaintiff asserts that there are numerous similarities between the principal and secondary characters of the two works. The Court finds that the alleged similarities between characters are not protectable, and therefore do not satisfy the substantial similarity analysis. The Court addresses the alleged similarities between the two main characters to illustrate its reasoning.

Plaintiff contends that the main male character in Defendants' Film, Frank, is a combination of male principal Detective Dobbs and two secondary characters in Plaintiff's Manuscript. Plaintiff does not provide specific examples to demonstrate his claim.

Frank is a tenacious researcher who explicitly breaks the rules to continue his research. After his wife Zoe dies in the course of a forbidden experiment, Frank uses the "Lazarus serum" in a desperate attempt to bring her back to life. Dobbs, in contrast, is characterized as a rugged detective who "never broke [the rules]," but instead reinvents them in the pursuit of justice.  Manuscript, p. 8.  The Court finds no

17.

1  meaningful similarities between the two male principals that would satisfy the

2  substantial similarity analysis.

3       Plaintiff also contends that the female main character in Defendants' Film, Zoe,

4  is an amalgamation of female principal Detective Ellion (in light of her working

5  relationship with Detective Dobbs) and other minor characters (who may have been

6  reanimated). Again, Plaintiff does not provide specific examples to demonstrate his

7  claim.

8       In Defendants' Film, pre-reanimation Zoe is an ambitious researcher like her

9  husband Frank, and post-animation is a possessed killer. In Plaintiff's Manuscript,

10  Ellion is described as a beautiful, resilient detective who is just as smart as she is

11  attractive.  Manuscript, p. 8.  The mere fact that two female characters are smart,

12  resilient, or attractive is not a basis for a copyright infringement claim.

13       Additionally, Plaintiff alleges that Zoe is similar to two minor characters in

14  Plaintiff's Manuscript because the two minor characters may have also been

15  reanimated. Even if they were reanimated, such characteristics of the minor characters

16  are not protectable expression. Many literary works in the past have depicted

17  characters who were reanimated or have otherwise risen from the dead. Plaintiff

18  asserts no protectable elements of the character Ellion, and therefore cannot satisfy the

19  substantial similarity analysis thereto.

20  **V.     CONCLUSION**

21       In light of the foregoing, the Court finds that Plaintiff has failed to demonstrate

22  that Plaintiff's Manuscript and Defendants' Film are substantially similar regarding

23  protectable elements.  Plaintiff is therefore unable to establish substantial similarity as

24  a matter of law.  Although only two of the named Defendants filed this motion,

25  Plaintiff asserts the very same copyright infringement claim against all Defendants, so

26  the above analysis governs the entire First Amended Complaint.  Furthermore,

27  Plaintiff cannot replead his claim to overcome his inability to prove that the works are

28  substantially similar.

Therefore, the Court **GRANTS** Defendants' Motion to Dismiss and hereby **DISMISSES WITH PREJUDICE** Plaintiff's entire First Amended Complaint.

**IT IS SO ORDERED.**

Dated: July 7, 2017

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

19.